UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. 05-386 (ESH) |
| v. | : | |
| ADRIAN JACKSON | : | |
| Defendant. | : | Judge Ellen Segal Huvelle |

## APPEAL OF RELEASE ORDER

*COMES NOW*, the United States of America, by and through its Attorney, the United States Attorney for the District of Columbia, and respectfully moves this Court to reverse a decision of a Magistrate Judge to release defendant Jackson pending trial. The record shows that no condition nor combination of conditions for the defendant's release can reasonably assure the safety of the community. Thus, the United States asks the Court to hold the defendant without bail pending trial. In support the United States says as follows:

### BACKGROUND

Defendant Jackson is a significant participant in a large-scale narcotics conspiracy that knowingly and intentionally distributed and possessed with intent to distribute numerous kilograms of cocaine, and cocaine base, also known as crack cocaine over the course of at least the past few months. At the time of his arrest he was armed and acted in a fashion that potentially risked his life and that of agents and officers searching his residence. Additionally, Jackson's criminal history shows that less than two years ago he was convicted of assault and carrying a handgun.

Members of the charged conspiracy conducted their illegal drug business in locations throughout Washington, D.C. and suburban Maryland. Search warrants executed in connection

with the investigation on Monday, October 24, 2005, led to the seizure of 97 kilograms of cocaine hydrochloride, 3 kilograms of crack, and close to $1 million from a stash house utilized by this organization. Drugs, guns, paraphernalia, and considerable sums of cash were seized from various other locations associated with members of the conspiracy. Recovered from the residence of Adrian Jackson were a handgun, a bag of crack cocaine weighing 41 grams, $2700 in cash, a digital scale, and pay stubs in Jackson's name. Further details regarding the investigation are set forth in a written proffer in support of detention, which was submitted to Magistrate Judge Robinson. That proffer is attached, and incorporated by reference herein.

The proffer as a whole showed that defendant Antoine Jones was receiving large amounts of cocaine at least monthly and then redistributing it in probably kilogram quantities to a small group of associates. Jackson was one of this group, as well as working with Jones at Levels, a club Jones owned. The paragraphs of the written proffer most relevant to Jackson are set forth below.

13. Further, at 10:33 a.m., **JONES** received a call from **GREGORY HAWKINS**, whom **JONES** refers to as his "partner" at various times during the interception period and whom investigators believe to be the money-man in the operation, at (202) 286-3057. **JONES** told **HAWKINS** that he was in his house, but was about to go to Baltimore to look at houses. **JONES** asked **HAWKINS** whether he had "done that math homework." **HAWKINS**, who sounded exasperated, stated: "there's no way in the world . . . I don't want to argue over it, there's nothing I can do about it, but I'm telling you, it's ridiculous . . . ." **JONES** told him that he wished he could take **HAWKINS** "there to see," and then asked "what was it, $3? $2?" **HAWKINS** replied that it was "way way more than that." **JONES** then slipped and asked

2

whether it was "more than 3,000, I mean $3." **HAWKINS** told **JONES** that it is more than 5, "that's why I'm saying something's gotta be wrong." They agree to discuss the matter further after **JONES** returns from his house-hunting trip to Baltimore. Investigators believe that this conversation refers to a shortage of cash with respect to a narcotics deal. As noted, at one point, **JONES** slips and refers to "3,000" but then recovers, saying "I mean, $3." In addition, a money counting machine can be heard in the background.

14. **JONES**, having returned from Baltimore, called **HAWKINS** again at (202) 286-3057, at 2:14 p.m. **JONES** asked **HAWKINS** whether he was in the house, and when he responded that he was, **JONES** stated that he was coming over because he needed to talk to him. A few minutes later, **JONES** received an incoming call from <u>**ADRIAN JACKSON**</u>, whom he had also referred to as his "partner" in other intercepted conversations, and told <u>**JACKSON**</u> that he was going over to his man's house around the corner. Investigators believe that **JONES** was going to meet with **HAWKINS** to discuss the financial problem discussed in the call earlier that day, and that **JONES** was informing <u>**JACKSON**</u> of his efforts to clear up the problem.

30. It is further apparent from wire interceptions that **JONES** anticipated another shipment of cocaine on October 13, 2005. For example, on October 12, 2005, at 12:36 p.m., **JONES** received a call from **BREMEA** at (909) 975-0957, who stated: "hey, the girls are coming tomorrow night." To which **JONES** responded in an animated voice: "gotcha, gotcha, gotcha." Then, in his next call, at 12:44 p.m., **JONES** called **JOHN ADAMS**, and told **ADAMS** to tell his brother-in-law "sometime tomorrow." Clearly confused, **ADAMS** said "huh?" **JONES** said "brother-in-law. Youngin didn't tell you about brother-in-law?" **JONES** repeated "tomorrow" several times throughout the conversation. Finally **ADAMS** seemed to

understand, saying "Tomorrow? Oh, okay, you must mean my cousin." **JONES** told **ADAMS** that he needed to "see you all" today so that he could be ready with his video tomorrow. (Investigators believe that in this conversation, **JONES** is telling **ADAMS** that he needs to collect money from his customers to be ready for the cocaine shipment the following day). Then, at 12:47 p.m., **JONES** received a call from an unknown subscriber using cellular telephone number (202) 286-3057, who told **JONES** that he just wanted **JONES** to know that he was back. **JONES** and the caller discuss their whereabouts, and then at the end of the brief conversation, **JONES** said to the caller: "I was talking to your uncle, they they, he said he's gonna come talk to you tomorrow." Next, at 1:40 p.m., **JONES** received a call from **MIKE HUGGINS**. **JONES** told **HUGGINS** that he spoke with "Playboy" and then stated "tomorrow sometime, man." **HUGGINS** replied that he was waiting on **JONES**. Later, at 3:05 p.m., **JONES** called <u>**ADRIAN JACKSON**</u> and said: "Um, tomorrow." After there was a pause, **JONES** asked: "you know what talking about? Your uncle." **JACKSON** replied: "alright." **JONES** stated: "tomorrow." Further, at 7:40 p.m., **JONES** called (202) 286-3057, which is registered in the name of Kim's Wireless, at 1801 Pennsylvania Avenue, and believed to be in use by **JONES**'s "partner" **GREGORY HAWKINS**, and told the unknown male that "Youngin said he will probably see us tomorrow evening." The male replied "alright," and the pair hung up. Finally, at 9:18 p.m., **JONES** received an incoming call from an unknown male using telephone number (202) 276-5208. This male wanted to borrow $7,000 from **JONES** to pay two of the bands who perform and at **LEVELS**. **JONES** told the male that he didn't have that kind of money on him now, but noted that the man's uncle was supposed to be in town the following day. In sum, investigators believe that this pattern of thinly-veiled calls relates to the initial call from

BREMEA at (909) 975-0957, indicating that something would be coming into town the following day, presumably a large quantity of cocaine. Throughout the day, **JONES** communicated with several of his customers, referring to this call with their "uncle" or other relative - **BREMEA** - and indicating that he would be in town the following day.

31. While it is not precisely clear when that shipment arrived, as of Saturday, October 15, 2005, **JONES** was flush with cocaine again. At 10:10 a.m. that day, **JONES** called **JOHNSON** and asked whether **JOHNSON** wanted him to come through and catch him. **JOHNSON** replied that he was still waiting on two dudes, and would call **JONES** as soon has he had caught up with them. Shortly thereafter, **JONES** called **HUGGINS** and told him he was about to "make a run" and asked what was up with **HUGGINS**. The pair agreed to meet at the Lowe's home improvement store in Clinton, Maryland. A subsequent call, at 11:45 a.m., revealed that **JONES** and **HUGGINS** met up at the Lowe's. Over the course of the next several hours, **JONES** called **GREGORY HAWKINS, KIRK CARTER, FNU, LNU, a/k/a JAUON JENKINS, JOHN ADAMS, DEMETRIUS JOHNSON, and <u>ADRIAN JACKSON</u>** arranging similar meetings. Investigators believe that **JONES** delivered cocaine to each of these individuals throughout the day.

33. Finally, wire interceptions over the last few days of the interception period made clear that **JONES** and his associates were continuing their pattern of drug trafficking activity, as set forth above. For example, on October 17, 2005, at 4:51 p.m., **JONES** called **CARTER** and asked whether he wanted some tickets. **CARTER** replied that he would come see **JONES** the following day. **JONES** mentioned that the tickets were $10.50, and **CARTER** said that he didn't know that. They agree to discuss the price difference in person, not over the phone.

Further, **JONES** received a telephone call from **BREMEA**, from (909) 975-9057, who said that he just wanted to let **JONES** know that "I took off where I live, and I will be out for a day or two." To which **JONES** replied: "Ah, man." **BREMEA** said that he would call **JONES** as soon as he got back. True to his word, mid-day on October 19, 2005, **BREMEA** called **JONES** again, and indicated that he would be back in the area at approximately 5:00 p.m. Also, late-morning this same day, **JONES** received a call from UM-1, another Hispanic male whom investigators believe to be associated with **BREMEA** in **JONES'** supply chain, indicating that something would be happening on Friday (October 21, 2005). Investigators believe that these telephone calls from **JONES's** suppliers are tipping **JONES** off to the timing of the arrival of a large shipment of cocaine.

34. On Friday October 21, 2005, and Saturday October 22, 2005, intercepted calls indicated that **JONES** was planning to be out of the area but would return on Sunday, October 23, 2005. When **JONES** returned on Sunday, he spoke to or attempted to speak to **HUGGINS**, **ADAMS**, **JOHNSON**, <u>**JACKSON**</u>, and **CARTER**. In one of the intercepted calls **JONES** indicated that he had to "make the rounds." The investigators interpreted these events as an indication that **JONES** had obtained a supply of drugs and was in the process of distributing them to his usual customers.

35. <u>**ADRIAN JACKSON**</u>

**7921 Allendale Drive, Landover, Maryland**

This address is the where Adrian **JACKSON** is currently residing. **JACKSON** has been overheard telling **JONES** that he is staying at his "Ma's." Based on telephone calls between **JONES** and **JACKSON** in which they arrange to meet, and surveillance of **JONES** thereafter,

Investigators know that **JONES** traveled to the above described address to meet with **JACKSON**. Further, on October 16, 2005, at approximately 09:40 a.m., and October 18, 2005, at approximately 08:24 a.m., physical surveillance of this location revealed a silver Chrysler 300M bearing D.C. tag CA1898. This vehicle is registered to **ADRIAN JACKSON** and is known to be the primary vehicle driven by **JACKSON**. Finally, on October 20, 2005, **JACKSON** is intercepted on the wire telling **JONES** that he is about to "lay down." Shortly thereafter, physical surveillance of this location revealed the Chrysler parked outside that location.

**JONES** considers **ADRIAN JACKSON** to be his "partner" not only at his night club, **LEVELS**, but also a partner in his narcotics trafficking. **JONES** and his wife are currently helping **JACKSON** purchase a house. To this end, they have given **JACKSON** money for a down payment. The following is a sampling of conversations illustrating the above: On Wednesday, October 12, 2005 at 3:05 p.m., after **JONES** received a call from **BREMEA** who told him that "the girls are coming tomorrow night," he telephoned **JACKSON**. **JONES** told **JACKSON**, "Tomorrow." There is a pause after which **JONES** asks **JACKSON** if he knows what **JONES** is talking about? "Your uncle." **JACKSON** says "alright." **JONES** reiterates, "tomorrow." Given that **JONES** made several other phone calls within a short time of this call to other of his standard customers, alerting them to the arrival of their "uncle" or "cousin," investigators believe that this reference to "your uncle" refers to **JONES's** Hispanic cocaine supplier. In addition, in this same telephone conversation, **JONES** and **JACKSON** discuss plans for **JACKSON** to meet with **JONES's** wife, who has a real estate license, to continue house-hunting.

7

When the search warrant was executed, **JACKSON** was found in the house. Also found were a small bag of crack cocaine, electronic scales, which are associated with narcotics packaging, a handgun, and $2700 in cash.

Some additional information was proffered orally in the court below and is relevant on this appeal as well. At the time the search warrant was executed on Jackson residence, slightly after 6:00 a.m. on Monday, October 24, 2005, several officers were assigned to the rear of the dwelling, a standard procedure to prevent escape or the discarding of evidence by people in the building being searched. As the raid team was making entry, one of the officers in the back observed a nude black male with a gun in his hand by his side at a rear window of the house. The officer immediately yelled at the figure that he should freeze. At this point the mini blinds in the window were lowered and the office could no longer see the figure. Within seconds the raid team was inside. Jackson was the only black male in the residence. A gun that appeared to be the same as the one observed by the officer was found in a closet immediately adjacent to the window and near where Jackson was found by the officers making entry.

Subsequent to the written proffer evidence, processing determined that the weight of the bag of crack located was 41 grams. Some of Jackson's pay stubs from Levels were also located in the residence.

## ARGUMENT

This Court should overturn the decision to release the defendant and order him held without bail instead. When detention has been denied, 18 U.S.C. § 3145(a) states:

> (a) Review of a release order – If a person is ordered released by a magistrate, . . .
>
> (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release . . .

The motion shall be determined promptly.

On the government's motion to appeal a release order, this Court considers *de novo* the Magistrate Judge's denial of pre-trial detention. In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument. It may take additional evidence from new witnesses or consider arguments not raised previously. In short, the Court may proceed in the way that best enables it to answer the question posed: whether any condition or combination of conditions will reasonably assure the safety of any other person and the community? To that end, it is worthwhile recalling Congress' intent in 1984 when it enacted the current version of the Bail Reform Act:

> Many of the changes in the Bail Reform Act reflect the . . . determination that Federal bail laws must . . . give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released. . . . The constraints of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to those defendants who pose an especially grave risk to the safety of the community. . . . ***This broad base of support for giving judges the***

9

> *authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.*

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3486-3487. (Emphasis added.)[1]

---

[1] The Court must always consider whether defendant's release is a danger to the community. This point is made throughout the Bail Reform Act. Section 3142(e), which authorizes detention without bail pending trial, which reads:

> If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required *and the safety of any other person and the community*, such judicial officer *shall order* the detention of the person before trial.

Emphasis added. Similarly, § 3142(f) reads:

> The judicial officer shall hold a hearing to determine whether any condition of combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person *and the safety of any other person and the community* –
>   (1) upon motion of the attorney for the Government, in a case that involves,
>     (C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 *et seq.*) . . .

Emphasis added. This point is again made in § 3142(g), **Factors to be considered,** which states:

> The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required *and the safety of any other person and the community*, take into account the available information concerning –
>   (1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
>   (2) the weight of the evidence against the person;
>   (3) the history and characteristics of the person . . .
>   (4) *the nature and seriousness of the danger to any person or the community that would be posed by the person's release.* . . .

(Emphasis added.)

No condition of release nor combination of them can ensure that the defendant will not pose a danger to the community if released. This is based first upon the presumption to that effect written into the Bail Reform Act. 18 U.S.C. § 3142(e) ("Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions of release will reasonably assure the . . . safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act."). This presumption, triggered by indictment, is reinforced overwhelmingly by the facts of the case.

The defendant is a significant member of a drug organization, and an armed one at that, with a prior history of assault and a handgun violation. The facts laid out highlight the danger that Jackson's release would pose. As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . . . The Committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the "safety of any other person or the community.

S.Rep. No. 225, *supra*, at 3195-3196.

Against these facts, the defendant relies on community ties to overcome the presumption that he should be held pending trial. Again, the framers of the 1984 Bail Reform Act thought differently. "The Committee also notes with respect to the fact of community ties that it is aware of the growing evidence that the presence of this factor does not necessarily reflect a likelihood

11

of appearance, and has no correlation with the question of the safety of the community." S.Rep. No. 225, supra, 3207. Nor is it clear why community ties, which did not at all stop this defendant from selling drugs as described above, now will keep him from doing so again.

Counteracting the representations made by the defendant is the seriousness of the charges he faces, and the strength of the government's evidence, which the Court must also consider in determining whether the defendant has overcome the presumption that there are no conditions of release that would ensure the safety of the community. 18 U.S.C. § 3142(g). The government has numerous wire interceptions capturing the defendant discussing drug trafficking with his supplier, Antoine Jones. There is also surveillance that confirms this activity. And finally, there is the seizure of narcotics and trafficking paraphernalia from the defendant's residence, along with the seizure from the group's stash house of 97 kilograms of cocaine, 3 kilograms of crack, and close to $1 million in cash. In addition, this defendant is charged with Conspiracy to Distribute and Possess with Intent to Distribute Cocaine, and Cocaine Base; if convicted, the defendant faces a sentence of from between ten years to life.

In summary, the defendant's release constitutes a clear, convincing danger to the community. The order releasing him should be reversed for the reasons set forth above and for any other reasons appearing at a hearing on this motion.

                                        Respectfully submitted,

                                        KENNETH L. WAINSTEIN
                                        United States Attorney
                                        DC Bar No. 451058

RACHEL CARLSON LIEBER
Assistant United States Attorney
DC Bar No. 456-491
555 Fourth Street, N.W.
Room 4820
Washington, DC 20530
(202) 353-8055

JOHN V. GEISE
Assistant United States Attorney
DC Bar No. 358-267
555 4th Street, N.W., Room 4112
Washington, DC 20530
(202) 616-9156

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion has been served, by hand, on Ton Abbentante Esq., counsel for defendant Jackson, on this ___ day of October, 2005.

_____
RACHEL CARLSON LIEBER
Assistant United States Attorney